786 F.2d 1165
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
ELIZABETH McDONALD, Plaintiff-Appellant,
vs.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 85-3322
 United States Court of Appeals, Sixth Circuit.
 2/25/86
 
 N.D.Ohio
 AFFIRMED
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO
 Before: CONTIE, Circuit Judge; PECK, Senior Circuit Judge; and GIBSON, District Judge.*
 PECK, Senior Circuit Judge, dissents from the majority opinion.
 PER CURIAM.
 
 
 1
 Elizabeth McDonald appeals from an order of the district court granting summary judgment in favor of the Secretary on McDonald's complaint seeking judicial review pursuant to 42 U.S.C. Sec. 405(g) of the Secretary's decision denying McDonald's application for Social Security disability benefits and supplemental security income. On appeal, McDonald contends that the Secretary erred (1) in concluding that she did not suffer from a listed impairment pursuant to 20 C.F.R. Pt. 404, Sbpt. P, App. 1, Sec. 12.05(c); (2) in failing to assign greater weight to the conclusions of her treating physician; (3) in applying Rule 203.22 of the 'grid' despite the presence of nonexertional impairments; and (4) in concluding that her nonexertional impairments were not 'severe', 20 C.F.R. Sec. 404.1520(c). For the reasons that follow, the judgment of the district court is affirmed.
 
 I.
 
 2
 On September 28, 1979, Elizabeth McDonald (claimant) applied for disability insurance benefits, listing as disabilities 'heart block, hypertension, arthritis of spine, phlebitis, diabetes.' Claimant reported that she was born January 29, 1931, and was unable to work due to her disability, beginning on August 23, 1979. On October 1, claimant filed an application for supplemental security income. On November 21, 1979, the Secretary denied benefits, and, on February 19, 1980, the Secretary denied reconsideration.
 
 
 3
 Claimant's vocational report indicated that she worked at Northside Hospital in Youngstown, Ohio, from 1955 to 1979 as a patient technician. Claimant indicated that her job involved taking morning temperature and blood pressure, picking up trays, changing dressings, taking patients to showers, testing urine, answering lights, and general cleaning. Claimant described the job as requiring seven (7) hours per day of walking, seven (7) hours per day of standing, one (1) hour per day of sitting, and frequent bending and reaching. Claimant indicated that she is a high school graduate and was trained as a patient technician for six months.
 
 
 4
 A hearing before an administrative law judge was held July 2, 1980. Claimant testified that she has chest pain, arthritis in her spine, hands, wrists, fingers and ankles, hypertension, and diabetes. Claimant takes various medications for her high blood pressure, diabetes, arthritis, and chest pain. Claimant expressed her disagreement with the physical capacities evaluation submitted by her physician Gust Boulis, M.D. Boulis had indicated that claimant could sit for two (2) hours per day, stand for one (1) hour, and walk for three (3) hours, lift and carry up to 10 pounds frequently and lift and carry up to 20 pounds. Claimant testified that she experiences lower back pain when she sits, and that sometimes the pain prevents her from walking.
 
 
 5
 Claimant is 5'10" and 210 pounds. Claimant indicated that she is able to bathe herself and often fixes her own meals. Claimant climbs stairs and washes dishes. Claimant goes to the doctor, church (3 days per week) and the store, but no longer drives. Mary Tucker, claimant's minister also testified that claimant is unable to work, or do housework. Tucker testified that claimant is nervous.
 
 
 6
 Vocational expert Kenneth Jenkins testified that McDonald was semi-skilled and that her job at the hospital was medium to light work. Claimant indicated that she could not do sedentary work with her hands due to her arthritis. Jenkins indicated that claimant's ability to make and record measurements would be transferable, in addition to her capacity to learn. Jenkins indicated that claimant could perform as a buffer, salad maker, assembler of small parts, thread molder, food packager, packer, and cook's helper despite her low I.Q. and depression. Jenkins also testified that claimant could serve as a ward clerk in a hospital.
 
 
 7
 Claimant was admitted to the hospital on March 28, 1978 complaining of angina-like pain. The record indicates that claimant at that time had suffered from diabetes for five years and hypertension for seven years. Dr. Boulis' diagnostic impressions included coronary artery disease, diabetes, and hypertension. Claimant had a normal EKG. Chest x-rays revealed clear lung fields and a heart within normal size limits. Barium enema, cholecystogram and excretory urogram were normal. A very small hiatus hernia was found. During a hospitalization in August and September 1979, a treadmill test was halted due to lightheadedness and chest pain. A coronary catheterization found ventricular contractibility fair and coronary arteries intact. Claimant's condition was improved on discharge with diagnosis as diabetes.
 
 
 8
 A hospital medical report of August 31, 1979, listed diagnostic impression as diabetes, possible coronary artery disease, osteoarthritis, and hyperchondriasis. A chest x-ray showed slight cardiomegaly, but no acute lung disease. A left ventricular angiogram and coronary arteriogram were normal. An EKG of September 1, 1979 was normal.
 
 
 9
 Claimant was seen by clinical psychologist Joseph A. Spera on May 8, 1980. Spera found that claimant was at the 'borderline retarded level' with a full scale IQ of 77 and verbal and performance IQs of 87 and 66, respectively. Considering the Vineland Social Maturities Scale, Spera found that claimant's functioning was 'borderline deficient.' The Wide Range Achievement Test and Peabody Individual Achievement Test demonstrated that claimant has 'only marginally functional literary skills as well as well below average computational ability.' Spera also found below average skills on the Bender Visual-Motor Gestalt Test and Revised Minnesota Paper Form Board Test. Spera found claimant was in contact with reality and found no psychotic process. Spera found moderate depression. Spera diagnosed borderline mental retardation and moderate situational distress.
 
 
 10
 Even as a nurse's aide, I would see her as being only marginally functional due to her mental limitations, as well as her moderate level of depression and anxiety. To the extent that her physical complaints can be verified medically, it would seem to me that she is incapacitated to the point where she could not compete in the regular labor market.
 
 
 11
 On August 8, 1980, the ALJ denied benefits, reviewing the medical evidence, but concluding that, in light of claimant's testimony, appearance, and medication, claimant's testimony regarding the incapacitating nature of her pain was not credible. The ALJ found that claimant could not return to her past work and suffered from exertional (diabetes, mild cardiomegaly, arteriosclerotic cardiovascular disease, angina pectoris, coronary artery disease) and nonexertional (IQ, depression) impairments. The ALJ credited the physical capacities evaluation by Dr. Boulis, and found that claimant could perform the jobs cited by the vocational expert. Accordingly, the ALJ found that claimant was not disabled.
 
 
 12
 Claimant sought review on the ground that her low IQ prevented her from making a meaningful waiver of her right to counsel, but on January 12, 1981, the Appeals Council denied review. Also in the record is the report of Nissam Benado, M.D., a psychiatric evaluation of January 9, 1981, which diagnosed severe anxiety neurosis with severe depression and chronic brain syndrome associated with arteriosclerosis. Benado concluded that McDonald 'is a very sick person' who was unable to work. On May 19, 1981, the Appeals Council, after review of Benado's report, concluded that there was 'no objective evidence of severe depression.' Further, '[w]hile the claimant's IQ test results meet the criteria set forth in the Social Security Regulation Listings of Impairments, she does not have any other physical or mental impairment . . ..'
 
 
 13
 Claimant sought review in district court and both parties sought summary judgment. On April 2, 1982, a magistrate's report concluded that the Secretary's decision was supported by substantial evidence, ut found remand appropriate on the ground that claimant was not represented by counsel at the hearing and could not effectively represent herself due to her low IQ. The report found that claimant was not sufficiently examined regarding her non-exertional impairments and that the hypothetical to the vocational expert did not mention these impairments. On April 27, 1982, the district court adopted the magistrate's recommendation and remanded the case. On September 27, 1982, the Appeals Council remanded the case to the ALJ.
 
 
 14
 On January 5, 1981, Dr. Boulis reported that McDonald was disabled due to her hypertension, osteoarthritis and coronary artery disease. Boulis indicated that claimant's chest pain is relieved by rest. At the Secretary's request, claimant was examined by Francis K. Kravec, M.D., who, on January 19, 1981, diagnosed claimant as suffering from diabetes, hypertension and gross obesity. 'Patient's chief reason for impairment is the gross obesity.' An electrocardiogram was normal.
 
 
 15
 On September 16, 1982, claimant again applied for disability insurance benefits and supplemental security income, which were denied on December 2, 1982. In a vocational report of September 16, claimant reported that she does cooking and light cleaning, attends church daily, and watches TV. Claimant apparently was readmitted to the hospital July 29, 1982 for removal of teeth.
 
 
 16
 The November 18, 1982 report of Brian S. Gordon, M.D., an examining physician, indicated claimant's admission that she can lift five to ten pounds. Chest x-ray was normal, hand x-ray revealed osteoarthritic spurring of the two joints of the left thumb and wrist. Claimant failed to complete a stress electrocardiogram due to chest pains and shortness of breath. Gordon diagnosed diabetes, osteoarthritis and hypertension, and concluded that 'the patient complains of orthopnea and paroxysmal nocturnal dyspnea but most of this appears to be related to her exogenous obesity rather than intrinsic cardiac disease.'
 
 
 17
 A report of March 31, 1983 by psychiatrist Emil R. Constantinidi stated that claimant told him she left her job after being injured when lifting a heavy patient. This is the first time this fact appears in the record. Constantinidi diagnosed psycho-physiological disorder and dependent personality disorder, found that claimant was a psychosomatic complainer, and concluded that '[p]rognosis seems poor as her ability to stand any ordinary pressure at work even though she is able to comprehend supervisory's instructions and/or relating to coworkers.' Constantinidi concluded, however, that claimant's intellectual functioning was preserved.
 
 
 18
 Claimant was examined on March 30, 1983 by Robert Gilliland, M.D., who reported that claimant 'cries with palpation of the joints,' but found 'no obvious joint deformity or redness.' Gilliland found that claimant's motor weakness was a product of inactivity, and diagnosed diabetes, arthritis, hypertension and obesity. Gilliland concluded that claimant could sit or stand for 20 to 30 minutes, could lift or carry two pounds, could walk 1/2 block, and has difficulty bending.
 
 
 19
 On June 16, 1983, a hearing was held before the ALJ much of which was repetitive of the initial hearing. Claimant indicated she could do no work due to her shortness of breath and arthritis. Claimant uses a cane to avoid losing her balance. Claimant testified that she prepares all her own meals, washes dishes, watches TV, reads, and attends church four days each week. Claimant does not drive, can lift her pocketbook, and has problems standing for more than 30 minutes. Claimant's arthritis bothers her when she bends. Claimant suffers from bad headaches, and could not stand the pressure of work. Claimant testified that she received grades of B and C in high school.
 
 
 20
 Joel Steinberg, M.D., testified as a medical advisor that claimant's headaches were probably caused by some of her medications. Steinberg concluded, based on claimant's academic and job success, that the IQ of 66 was 'spuriously low.' Steinberg opined that claimant could do medium work.
 
 
 21
 On July 29, 1983, the ALJ denied benefits, concluding that claimant could not return to her former job, that she did not suffer from a listed impairment, that her non-exertional impairments were not 'severe,' that she retains the capacity to do medium work, that claimant's allegations of pain are not credible or supported by medical evidence, and that Rule 203.22 provides a framework for concluding that claimant is not disabled. The ALJ found claimant's psychiatric impairment non-severe in light of her independent living, self-care, and religious involvement, and discounted her 66 IQ result in light of her academic and vocational background. On October 28, 1983, the Appeals Council adopted the ALJ's decision.
 
 
 22
 Claimant again sought review in district court pursuant to 42 U.S.C. Sec. 405(g), the parties moved for summary judgment, and on March 8, 1985, the district court granted the Secretary's motion and denied claimant's. We consider claimant's four assignments of error below.[1]
 
 II.
 
 23
 Claimant's first contention is that the Secretary erred in failing to find that she suffered from a listed impairment in light of her multiple impairments and her IQ test results. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 12.05(c) provides that the listed impairment of 'mental retardation' may be proved by proof of 'IQ of 60 to 69 inclusive (see 12.00B4) and a physical or other mental impairment imposing additional and significant work-related limitation of function.' Section 12.00B4 provides that '[w]here more than one IQ is customarily derived from the test administered . . . the lowest of these is to be used in conjunction with 12.05.' In this case, claimant's lowest score of 66 places her within the range of the listed impairment. However, the regulation further provides:
 
 
 24
 Mental retardation denotes a lifelong condition characterized by below-average intellectual endowment as measured by well-standardized intelligence (IQ) tests and associated with impairment in one or more of the following areas: learning, maturation, and social adjustment. The degree of impairment should be determined primarily on the basis of intelligence level and the medical report. Care should be taken to ascertain that test results are consistent with daily activities and behavior.
 
 
 25
 (Emphasis added). Further, Section 12.00A provides in part:
 
 
 26
 The evaluation of disability applications on the basis of mental disorders requires consideration of the nature and clinical manifestations of the medically determinable impairment(s) as well as consideration of the degree of limitations such impairment(s) may impose on the individual's ability to work, as reflected by (1) daily activities both in the occupational and social spheres; (2) range of interest; (3) ability to take care of personal needs; and (4) ability to relate to others. This evaluation must be based on medical evidence consisting of demonstrable clinical signs (medically demonstrable phenomena, apart from the individual's symptoms, which indicate specific abnormalities of behavior, affect, thought, memory, orientation, or contact with reality) and laboratory findings (including psychological tests) relevant to such issues as restriction of daily activities, constriction of interests, deterioration of personal habits (including personal hygiene), and impaired ability to relate to others.
 
 
 27
 In light of the regulations, the Secretary properly considered claimant's academic success, occupational success, independent living, and ability to care for herself as evidence that the 66 IQ test result was not representative of claimant's intelligence. Claimant's own description of her job where she served for 24 years, including the taking of temperatures and blood pressures, render the IQ score suspect. Accordingly, the Secretary's conclusion that claimant did not suffer from a listed impairment is supported by substantial evidence.[2]
 
 III.
 
 28
 Claimant contends that the ALJ erred in accepting the evaluation of Steinberg, the medical advisor, over that of Spera who conducted the IQ test and whose report concerning the test did not qualify the results, and of Benado who diagnosed chronic brain syndrome. Spera diagnosed borderline mental retardation and found a full scale IQ of 77. Spera had no reason to attempt to discount the 66 IQ since it was only one of many tests he considered. Spera never indicated that 66 was reflective of claimant's IQ or was consistent with her daily activities and background. The medical advisor considered an analysis which Spera did not. The regulations do not limit the Secretary to consideration of test results in isolation from other factors. The Secretary did not err in discounting the 66 IQ despite lack of comment from Spera. Likewise, we find no error in the Secretary's treatment of Benado's report. The record in this case is replete with medical evidence yet Benado was the only physician to diagnose chronic brain syndrome. The Secretary's conclusions are supported by substantial evidence.
 
 IV.
 
 29
 The claimant asserts that the Secretary erred in applying Rule 203.22 of the grid to conclude that claimant was not disabled. Section 200.00(e) of Appendix 2 provides that '[s]ince the rules are predicated on an individual's having an impairment which manifests itself by limitations in meeting the strength requirements of jobs, they may not be fully applicable where the nature of an individual's impairment does not result in such limitations. . . .' The section further provides that where the impairment is solely nonexertional the rules may be given consideration but do not direct factual conclusions of disabled or not disabled. Where an individual suffers from exertional and nonexertional impairments but a finding of disability is not required on account of the exertional impairment, the rules 'provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations.'
 
 
 30
 Even assuming that claimant suffers from non-exertional impairments, the Secretary's use of the rule was not improper where the ALJ principally indicated that he used the rule 'as a framework for decisionmaking.' Claimant's assignment of error is without merit.
 
 V.
 
 31
 Claimant contends that the Secretary erred in concluding that her non-exertional impairments were not severe. Where an individual does not have any impairment which significantly limits his physical or mental capacity to perform basic work-related functions, a finding shall be made that he does not have a severe impairment and therefore is not disabled. 20 C.F.R. Secs. 404.1520(c), 416.920(c). Basic work activity includes physical functions such as walking, standing, reaching, carrying; capacity to hear, see and speak; understanding and remembering simple instructions; use of judgment; and responding to supervision and co-workers. 20 C.F.R. Sec. 404.1521(b).
 
 
 32
 The record indicates that the Secretary's finding is supported by substantial evidence. Constantinidi found that claimant could comprehend supervisory instructions and relate to co-workers. This conclusion is supported by claimant's testimony regarding her happiness at her previous job, her participation in church activities, and her visitation with friends and relatives.
 
 
 33
 Accordingly, the judgment of the district court is
 
 
 34
 AFFIRMED.
 
 
 35
 Judge Peck, who would allow benefits, dissents.
 
 
 
 *
 The Honorable Benjamin F. Gibson, Judge, United States District Court for the Western District of Michigan, sitting by designation
 
 
 [1]
 We review the Secretary's findings of fact to consider whether the Secretary's decision is supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971). Substantial evidence is evidence which a reasonable mind might accept as adequate to support a conclusion. Id. at 401
 
 
 [2]
 In light of our conclusion that the IQ score is not consistent with claimant's lifestyle and background, and, therefore, does not satisfy section 12.05(c), we need not consisder whether claimant suffers from an impairment which imposes a significant work-related limitation