RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0232p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

FREDERICK DICKERSON,

*Petitioner-Appellant,*

*v.*

No. 04-4277

MARGARET BAGLEY, Warden,

*Respondent-Appellee.*

>

―――――――――――

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 00-02356—David A. Katz, District Judge.

Argued: February 2, 2006

Decided and Filed: July 7, 2006

Before: MERRITT, MARTIN, and SILER, Circuit Judges.

―――――――――――

**COUNSEL**

**ARGUED:** David L. Doughten, Cleveland, Ohio, for Appellant. Anna Marie Franceschelli, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee. **ON BRIEF:** David L. Doughten, Cleveland, Ohio, Jeffrey James Helmick, GAMSO, HELMICK & HOOLAHAN, Toledo, Ohio, for Appellant. Todd W. Newkirk, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee.

MERRITT, J., delivered the opinion of the court, in which MARTIN, J., joined. SILER, J. (pp. 11-12), delivered a separate opinion concurring in part and dissenting in part.

―――――――――――

**OPINION**

―――――――――――

MERRITT, Circuit Judge. In a fit of anger and jealousy, the petitioner Dickerson shot and killed Kevin McCoy, his girlfriend's new lover. At the same time he shot and killed an innocent bystander at the scene, Nicole McClain, a young girl, who happened to be present in the apartment when Dickerson killed McCoy. There is no question about Dickerson's guilt. Dickerson waived trial by jury in favor of trial before a panel of three judges as permitted under Ohio law. Finding two aggravating elements — (1) the killing of two persons (2) during the course of another felony, i.e., breaking and entering a home — which outweighed any mitigating circumstances, the three-judge

panel sentenced Dickerson to death.[1] Dickerson asserted a number of constitutional errors on appeal and in state post-conviction proceedings. After exhausting his remedies in the state courts, the federal district court denied all of his claims.

Our review of the record in this case reveals that counsel for Dickerson at the mitigation phase of the bifurcated proceeding rendered ineffective assistance of counsel in violation of the Sixth Amendment. Counsel did not properly conduct a mitigation investigation and, therefore, did not learn of or prove facts about Dickerson's family, educational, social and medical history — for example, with an IQ of 77, he was at the borderline of retardation — that would have given the three-judge panel strong reasons for reducing the penalty from death to life imprisonment. The decisions of the Ohio courts and the district court below excuse counsel's failure to investigate mitigation evidence on the ground of "trial strategy and tactics." This theory is flatly contradicted by the holdings of a series of Supreme Court cases and Sixth Circuit cases, as discussed below. We will first set forth the standard of review under AEDPA, 28 U.S.C. § 2254(d). We will next discuss this ineffective assistance of counsel claim as the basis for our granting of habeas relief requiring a new trial at the sentencing phase of the case. We will then focus on other claims that do not justify the grant of relief.

## I. Standard of Review

We review the record and Dickerson's constitutional claims against the backdrop of AEDPA, 28 U.S.C. § 2254(d). The statute limits the grant of federal habeas relief to cases in which a petitioner's state court "adjudication . . . (1) was contrary to, or . . . an unreasonable application of, clearly established Federal [Supreme Court] law . . . or (2) . . . was based on an unreasonable determination of the facts . . . ." Relevant Supreme Court precedent creating such AEDPA law includes "not only bright-line rules but also the legal principles and standards flowing from precedent," *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005) (quoting *Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002)), and cases establishing "a rule designed for the specific purpose of evaluating a myriad of factual contexts," *Wright v. West*, 505 U.S. 277, 309 (1992) (Kennedy, J., concurring), a standard elaborated by Justice Kennedy later adopted by the Court. *See Williams*, 529 U.S. at 391 ("That the *Strickland* test 'of necessity requires a case-by-case examination of the evidence' obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by this Court.") (internal citation omitted); *Rompilla v. Beard*, __ U.S. __, 125 S. Ct. 2456, 2471 (2005) (O'Connor, J., concurring) (noting the " 'case-by-case examination of the evidence' called for under our cases"); *Williams*, 529 U.S. at 382 (Stevens, J., dissenting in part) ("In the context of this case, we also note that, as our precedent interpreting *Teague* has demonstrated, rules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule."); *Graham v. Collins*, 506 U.S. 461, 506 (1993) (Souter, J., dissenting) ("One general rule that has emerged under *Teague* is that application of existing precedent in a new factual setting will not amount to announcing a new rule.").

A state court decision is contrary to clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405-06. A state court unreasonably applies clearly established Supreme Court precedent "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407.

---

[1] For a more complete recitation of the facts, *see State v. Dickerson*, 543 N.E.2d 1250 (Ohio 1989).

## II. Constitutional Standard for Ineffective Assistance of Counsel

A violation of the Sixth Amendment right to effective assistance of counsel has two elements: a petitioner must show (1) that counsel's performance was deficient, and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). It is beyond dispute that the *Strickland* standard, a broad standard of general application predating Dickerson's trial, constitutes in this case "clearly established Federal law, as determined by the Supreme Court of the United States." *See Williams*, 529 U.S. at 391; *Davis v. Straub*, 430 F.3d 281, 292 (6th Cir. 2005) (Merritt, J., dissenting) (discussing the Supreme Court's adoption of the "spectrum of abstraction" of *Teague v. Lane*, 489 U.S. 288 (1989), in construing 28 U.S.C. § 2254(d)(1)).

### A. Deficiency

### 1. Failure to Conduct a Thorough and Complete Mitigation Investigation

To establish deficiency, the first element of the *Strickland* test, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Carrying forward the "effective assistance of counsel" principles first established in capital cases in *Powell v. Alabama*, 287 U.S. 45 (1932), and *Strickland*, the Supreme Court, in the last three years, in two different death penalty ineffective assistance of counsel cases, has made it clear and come down hard on the point that a thorough and complete mitigation investigation is absolutely necessary in capital cases. The Court has relied on 1989 and 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, for the required norms and duties of counsel. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (incorporating the 1989 Guidelines as stating the required professional obligation to conduct a complete mitigation investigation); *Rompilla v. Beard*, __ U.S. __, 125 S. Ct. 2456, 2466 n.7 (2005) (relying on 2003 ABA Guidelines as "later, and current, ABA Guidelines relating to death penalty defense"). Our Court has also made it clear that this means that counsel for defendants in capital cases must fully comply with these professional norms, *Hamblin v. Mitchell*, 354 F.3d 482, 485-88 (6th Cir. 2003) (briefly outlining the historical development of the requirement of effective assistance of counsel in capital cases). In *Hamblin* we said that in order to satisfy the requirements of the effective assistance of counsel requirement of the Sixth Amendment, ABA Guidelines establish the relevant criteria:

> New ABA Guidelines adopted in 2003 simply explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence. The 2003 ABA Guidelines do not depart in principle or concept from *Strickland*, *Wiggins* or our court's previous cases concerning counsel's obligation to investigate mitigation circumstances . . . .

*Id.* at 487. We then quoted the ABA Guidelines that create the required standards of performance for counsel in capital cases regarding the investigation of mitigating circumstances, norms that Dickerson's counsel fell far short of meeting:

> Counsel's duty to investigate and present mitigating evidence is now well established. The duty to investigate exists regardless of the expressed desires of a client. Nor may counsel sit idly by, thinking that investigation would be futile. Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions unless counsel has first conducted a thorough investigation with respect to both phases of the case.

> Because the sentences in a capital case must consider in mitigation, anything in the life of the defendant which might militate against the appropriateness of the death

penalty for the defendant, penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history.  In the case of the client, this begins with the moment of conception [i.e., undertaking representation of the capital defendant]. Counsel needs to explore:

(1)Medical history, (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage).

(2)Family and social history, (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(3)Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

. . . .

(5)Employment and training history (including skills and performance, and barriers to employability);

. . . .

The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defense (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluation (including competency, mental retardation, or insanity), motion practice, and plea negotiations.

. . . .

It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others.  Records — from courts, government agencies, the military, employers, etc. — can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections.  Records should be requested concerning not only the client, but also his parents, grandparents, siblings, and children.  A multi-generational investigation frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment.  The collection of corroborating information from multiple sources — a time-consuming task — is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ¶ 10.7 (2003) at pp. 80-83.

Our Court's precedents also make clear that conducting a partial, but ultimately incomplete, mitigation investigation does not satisfy *Strickland*'s requirements. In *Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005), a case applying the pre-AEDPA standard of review, this Court found counsel's performance at sentencing deficient based on counsel's failure to investigate, even though counsel had conducted various interviews of the petitioner's family and acquaintances and had sought other information, including two competency evaluations. The Court held that counsel's performance was deficient because they failed to conduct a thorough investigation of the petitioner's mental health and family background, despite indications of his mental illness and troubled childhood. *Id.*

The district court, in its opinion below, faithfully outlined Dickerson's ineffective assistance of counsel claim in the following language:

> Dickerson claims that counsel were ineffective for failing to obtain mitigation evidence and present it during trial. Had counsel done so, Dickerson claims, counsel could have collected a host of mitigating evidence regarding his family background, including:
>
> 1. A father who denied his biological relationship with him;
> 2. The fact that Dickerson's siblings may all have different fathers;
> 3. Dickerson experienced early problems with bed wetting and stuttering;
> 4. Dickerson's mother referred to him as "the moron";
> 5. Dickerson had an ideation attachment to his mother that resulted in his failure to develop a meaningful relationship with another woman;
> 6. Dickerson was continually teased at school and became quiet and withdrawn;
> 7. Dickerson was raised in an atmosphere of pimps, prostitutes, and drug dealers. The younger children generally had to fight their way home from school. Several homosexual advances were made upon Dickerson.
> 8. Dickerson's relationships with women were unsuccessful. He fathered children with several women;
> 9. Dickerson's relationship with Denise Howard centered around prostitution and drugs. He believed that he had contracted a venereal disease from her.
> 10. Dickerson had a full-scale I.Q. of 77, placing him in the lower seven percent of cognitive ability;
> 11. Psychological testing would have explained his primitive thinking, how it developed and the effect the combination of the above had on his ability to make appropriate choices. It would have revealed that he had a borderline personality disorder. This disorder and its nexus to the offense would have been available to the panel.
>
> *Petition*, at 15. Respondent does not allege that this claim is procedurally defaulted. Thus, the Court will address the claim on the merits.

*Dickerson v. Mitchell*, 336 F. Supp. 2d 770, 809 (N.D. Ohio 2004).

The basis for these eleven factual propositions is a series of affidavits, including those of relatives, family friends and acquaintances, and a psychologist. (*See generally* App. 2686-2714, 2723-30, 2825-28.) The district court, like the state appellate court in this case, did not reject the ineffective assistance claim on any factual ground. Like the Ohio courts, it accepted Dickerson's

eleven-point factual statement of counsel's failures. It accepted these facts as well-established in the record. Neither the district court, nor the state court, asserts that defense counsel performed a full mitigation investigation, or discovered or offered at the trial any proof regarding this list of eleven propositions of fact asserted by Dickerson. The reasoning of both courts rejects the claim only because of so-called "strategic decisions" of counsel not to conduct such a comprehensive investigation. The district court simply accepted the reasoning of the Ohio state court by adopting its language, as follows:

> [T]he Sixth District Court of Appeals did not unreasonably apply United States Supreme Court precedent in its post-conviction appeal opinion denying this claim. It stated:
>
>> The record in this case and the affidavits provided by the appellant clearly indicate that the appellant's trial counsel made *strategic decisions* concerning the presentation of witnesses and testimony during the mitigation phase of trial. Thus, the trial court correctly held that the appellant's trial counsel did prepare and present mitigation evidence and that the type of mitigation evidence presented at the mitigation phase of the trial was the result of tactical decisions made by the appellant's trial counsel. Strategy and tactical decisions exercised by defense counsel well within the range of professional reasonable judgment need not be analyzed by a reviewing court. *Strickland*, *supra*.
>
> *State v. Dickerson*, No. L-98-1100, 2000 WL 28320, at *5 (Ohio Ct. App. Jan. 14, 2000). Although in summary form, the Sixth District's opinion is not an unreasonable application of *Strickland* and its progeny.

*Dickerson*, 336 F. Supp. 2d at 812-13 (emphasis added). These statements form the sole basis of the ruling of both courts on this issue. Neither court further explains what the "strategic" reasons of counsel were for not conducting any mitigation investigation of facts concerning Dickerson's "medical history," "family and social history," "educational history," or any of the other factors listed in the ABA Guidelines.

### 2. "Strategic Decisions" Must Be Based on Full Information

It seems obvious that the decisions of the district court and the state court unreasonably apply *Strickland*, *Wiggins*, and *Rompilla* and do not comply with the requirements of *Hamblin* and *Harries* or our Court's opinion in *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003). These cases say that strategic choices made after less than complete investigation will not pass muster as an excuse when a full investigation would have revealed a large body of mitigating evidence. It is not reasonable to refuse to investigate when the investigator does not know the relevant facts the investigation will uncover. As the Supreme Court has made clear, an incomplete mitigation investigation resulting from "inattention, not reasoned strategic judgment" is unreasonable, as is abandoning "investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527-28, 534. Had the investigation been conducted, reasonable lawyers surely *would not have limited* the mitigation proof in this case to simply an effort to show only that Dickerson was "provoked" by jealousy and could not control his impulses, and therefore suffered from "diminished capacity" at the time of the crime. They would have put on proof that his low IQ brought him close to the line of retardation and that his family background and educational and social history showed extreme deprivation that affected his moral culpability. The only significant mitigation proof was the testimony of two mental health experts who had

interviewed Dickerson for an hour and a half to determine if he was sane.  They simply testified that he was fully sane but in emotional turmoil.

It seems that counsel, as a result of an *ex parte* conversation with one of the judges, before waiving a jury, thought that the judges would not impose the death penalty.  Based on that one brief conversation in which the judge only suggested that Dickerson give consideration to a waiver of jury trial in favor of an Ohio three-judge panel, counsel drew the conclusion that the judges would not invoke the death penalty.  He thought that the *ex parte* judge would not have suggested a jury waiver but then vote to execute.   He was wrong.  But based on this conclusion, he not only waived the jury but also waived conducting the normal, necessary investigation required by ABA Guidelines referred to by the Supreme Court and our Court.  Without conducting a complete mitigation investigation, counsel did not know what an investigation would reveal and had no basis for making a "strategic decision" based on the *ex parte* conversation that the judges would not impose the death penalty based on "diminished capacity."  It was not reasonable to limit his investigation to the crime itself and the immediate mental state of the defendant when the crime was committed.  There was abundant mitigating evidence, much stronger evidence than the mental health testimony that Dickerson was sane when he committed the crime.  Accordingly, the state court unreasonably applied clearly established Supreme Court precedent when it simply assumed that counsel's oversights were motivated by strategy, instead of requiring a complete and thorough mitigation investigation as mandated by *Strickland* and its progeny.

## B.  Prejudice

We apply the test of prejudice established by the *Strickland*, *Wiggins*, and *Rompilla* cases, as recited in *Rompilla*:

> Since counsel's failure to look at the file fell below the line of reasonable practice, there is a further question about prejudice, that is, whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S., at 694, 104 S. Ct. 2052.  Because the state courts found the representation adequate, they never reached the issue of prejudice, App. 265, 272-273, and so we examine this element of the *Strickland* claim *de novo*, *Wiggins v. Smith*, *supra*, at 534, 123 S. Ct. 2527 . . . .
>
> . . . .
>
> This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test.  It goes without saying that the undiscovered "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Rompilla's] culpability," *Wiggins*, 539 U.S., at 538, 123 S. Ct. 2527 (quoting *Williams v. Taylor*, 529 U.S., at 398, 120 S. Ct. 1495), and the likelihood of a different result if the evidence had gone in is "sufficient to undermine confidence in the outcome" actually reached at sentencing, *Strickland*, 466 U.S., at 694, 104 S. Ct. 2052.

*Rompilla v. Beard*, __ U.S. __, 125 S. Ct. 2456, 2467, 2469 (2005).

Here, as in *Rompilla*, we review the prejudice element of the *Strickland* claim *de novo* because the state court did not reach this issue.  It is true, as our dissenting colleague argues, that the fact finder might still have imposed the death penalty even if all of the mitigating evidence had been revealed but the likelihood of a different result is sufficient to undermine confidence in the outcome.  Execution of the retarded is now forbidden by the Eighth Amendment.  As psychologist

Dr. James R. Eisenberg stated in his post-trial affidavit, Dickerson's IQ of 77 is very close to the retarded level. (App. 2728.); *see also United States v. Roane*, 378 F.3d 382, 408 (4th Cir. 2004) ("Johnson exhibited an IQ of 77, which indicated a 'generally impaired intelligence,' placing him 'just above the level of mental retardation.' "); *Matos v. Comm'r of Soc. Sec.*, 74 Fed. App. 235, 235 (3d Cir. Sept. 11, 2003) (unpublished) ("She received a total score of 77 on an Intelligence Quotient (IQ) test, indicating that she is within the borderline range of intellectual functioning."); *Hubbard v. Haley*, 317 F.3d 1245, 1254 n.16 (11th Cir. 2003) ("Hubbard's records . . . indicate a verbal I.Q. of 77 and a full scale I.Q. of 80 — both in the borderline mentally retarded range . . . ."); *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 971 (9th Cir. 2000) (full scale IQ of 77 classified as "Borderline Mental Retardation"); *Pickens v. Gibson*, 206 F.3d 988, 997 (10th Cir. 2000) (psychologist testified that "[p]etitioner was borderline mentally retarded, with an overall IQ of 77"); *McDonald v. Sec'y of Health & Human Servs.*, No. 85-3322, 1986 WL 16598, at \*2 (6th Cir. Feb. 25, 1986) (unpublished) (psychologist "found that claimant was at the 'borderline retarded level' with a full scale IQ of 77"); *Jackson v. Hollowell*, 714 F.2d 1372, 1380 (5th Cir. 1983) ("[A] psychologist . . . concluded that 'the inmate is functioning at a fullscale IQ of 77, placing him on the borderline average retardate level.' ").

> In *Adkins v. Virginia*, 536 U.S. 304 (2002), the Court explained retardation:
>
> It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition. 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds. 7th ed. 2000).

*Id.* at 309 n.5. Justice Stevens' opinion explained that "evolving standards of decency that mark the progress of a maturing society" — the Eighth Amendment standard to be applied to capital punishment — no longer support theories of retribution and deterrence as determined "by the standards that prevailed in 1685 when Lord Jeffreys presided over the 'Bloody Assizes' or when the Bill of Rights was adopted, but rather by those that currently prevail." *Id*. at 311-12. The opinion explains that dramatic recent changes in state laws on executing the retarded, as well as the law of civilized nations, means that such executions can no longer be tolerated. It would surely have made a significant difference for Dickerson if counsel had done the investigative work necessary to discover and then prove that he functioned at an intellectual level little above the retarded level.

If the sentencer had also learned that Dickerson was raised in a home where his biological father denied his relationship, where he was called "the moron," and was surrounded by "pimps, prostitutes and drug dealers," it is much more likely that the sentencer would have seriously contemplated a sentence of life imprisonment based on reduced culpability. An argument based on reduced culpability similar to that given by the Supreme Court in *Adkins* might well have been persuasive in Dickerson's case too.[2]

---

[2]The Court outlined the reduced culpability argument as follows:

> This consensus unquestionably reflects widespread judgment about the relative culpability of mentally retarded offenders, and the relationship between mental retardation and the penological purposes served by the death penalty. Additionally, it suggests that some characteristics of mental retardation undermine the strength of the procedural protections that our capital jurisprudence steadfastly guards.
>
> As discussed above, clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their

Moreover, any one of the three judges alone could have prevented imposition of the death penalty. *See* Ohio Rev. Code Ann. § 2929.03(D)(3) (West 2005) (unanimity required for death sentence). Likewise, "[u]nder federal law, one juror may prevent the death penalty by finding that mitigating factors outweigh aggravating factors." *Hamblin v. Mitchell*, 354 F.3d 482, 493 (6th Cir. 2003). The prejudice prong is satisfied if "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

Our Court's conclusion in *Harries v. Bell*, 417 F.3d 631, 640 (6th Cir. 2005) just as aptly applies in this case with its three judge panel of fact finders:

> It is possible, of course, that a jury could have heard the evidence described above, and still have decided on the death penalty, but, as the Supreme Court noted in *Rompilla*, that is not the appropriate test . . . Instead, we must ask whether "the available mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Harries's] culpability." *Wiggins*, 539 U.S. at 538, 123 S.Ct. 2527 (internal citation and quotation marks omitted).

In light of these considerations, Dickerson has sufficiently demonstrated that his counsel's failure to conduct a complete and thorough mitigation investigation prejudiced the outcome of the sentencing phase of his trial.

## III.  Other Issues

Having decided that constitutional error occurred at the sentencing phase of the trial, we need not decide, and we therefore pretermit other sentencing issues: (1) whether the trial court committed error in not properly considering "diminished capacity" as a mitigating factor (issue I); (2) whether the trial court improperly considered aggravating factors (issue V).

As to the guilt phase of the trial, we do not find that counsel committed ineffective assistance, nor that the trial court committed constitutional error by allowing Dickerson to waive trial by jury in favor of trial by a three-judge panel (issues II or III). In the present case there was a clear written jury waiver which was explained to Dickerson in detail from the bench. Even on the day of trial Dickerson repeated his desire to waive a jury trial. In waiving trial by jury, counsel was not ineffective. Counsel necessarily had to make a choice between the two modes of trial, and it was impossible to say at the time which would be better for his client. We find no professional norms that dictate how a lawyer and his client should go about making this choice. There are no standards set out in the case law or the ABA Guidelines that establish professional norms in this area.

## IV.  Conclusion

For the foregoing reasons, we reverse the decision of the district court and remand the case to the district court with instructions to issue a writ of habeas corpus vacating Dickerson's death sentence unless the State conducts a new penalty phase proceeding within 180 days of remand.

---

impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Adkins*, 536 U.S. at 317-18.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

SILER, Circuit Judge, concurring in part and dissenting in part. I concur with the conclusions by the majority in part III of its decision, that is, I agree that counsel was not ineffective during the guilt phase of the trial and that the trial court did not err by allowing Dickerson to waive trial by jury in favor of a trial by a three-judge panel. However, I respectfully dissent from the majority's conclusion that the Ohio Court of Appeals unreasonably applied Supreme Court precedent in finding that trial counsel was not ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), during the mitigation part of the trial.

I agree with the majority that the applicable Supreme Court law comes from *Strickland* and subsequent Supreme Court cases which have interpreted *Strickland*. I also agree with the majority that in Supreme Court precedence, the ABA Guidelines state the required professional obligation of conduct in mitigation investigation. *See Rompilla v. Beard*, 545 U.S. 374, 376 n.7 (2005); *Hamblin v. Mitchell*, 354 F.3d 482, 485-88 (6th Cir. 2003). I accept the criteria from those cases, although some attorneys must think it strange that counsel in 1985, when this case was tried, had to adhere to the 1989 ABA Guidelines and the 2003 Guidelines, which were adopted subsequent to the trial in this case. However, the rationale for these standards is explained in *Hamblin*, 354 F.3d at 487-88.

As the majority opinion states, the district court discussed the mitigating evidence which defense counsel did not produce at trial. It is true that the Ohio Court of Appeals found that strategic and tactical decisions were made by defense counsel in declining to put on additional mitigating evidence, and the district court found that that was not an unreasonable application of *Strickland*. Although I would not characterize the actions by defense counsel during mitigation as strategic choices, I suggest that Dickerson cannot establish prejudice here under *Strickland* sufficient for us to conclude that counsel was ineffective.

To assess the potential prejudice to the accused at sentencing, the court should weigh the evidence and aggravation against the total available mitigating evidence adduced at trial and in post-conviction proceedings, *see Wiggins v. Smith*, 539 U.S. 510, 534 (2003), to determine "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Where at least some evidence in mitigation has been researched and presented, Dickerson must show how counsel's alleged deficiencies prejudiced the outcome of his sentencing proceeding. *See Martin v. Mitchell*, 280 F.3d 594, 613 (6th Cir. 2002).

Dickerson's counsel presented eight witnesses in mitigation. Psychiatrists Gottlieb and Sherman testified that, at the time of committing the offenses, Dickerson lacked the substantial capacity to conform his conduct to the requirements of the law. Dr. Gottlieb described Dickerson's intense feelings of loss of control after his mother died and after Denise Howard left him. He concluded that Dickerson suffered from depression, had personality problems with antisocial and paranoid traits, felt powerless, and expressed rage and despair. Dr. Sherman diagnosed Dickerson as having a borderline personality disorder and emphasized that Dickerson was unable to tolerate separation and unable to integrate facts. He stated that it was unlikely that Dickerson would have committed the crimes if not for the loss of his mother and the loss of Howard. Dickerson's sister and estranged wife testified about his close bond to his mother, the severe depression he suffered after his mother died, and the deterioration in his appearance and behavior after Howard left him. Other witnesses recounted their contacts with Dickerson and said that he was a troubled man who regretted his conduct.

Although Dickerson claims that counsel could have collected additional mitigating evidence regarding his family background, much of his family background was introduced through family members and the psychiatrists. The majority suggests that the psychiatrists did not talk about Dickerson's IQ of 77, which is very close to the retarded level. However, it is not below the retarded level, and the psychiatrists testified that Dickerson had many mental problems. If Dickerson could prove that he was below the retardation line at the time of the offense, he had the right under *Adkins v. Virginia*, 536 U.S. 304 (2002), to show that he could not be executed at all. That issue is not before this court presently. The failure to produce all of Dickerson's family background did not amount to ineffective assistance. Although this evidence would have helped to explain the source of Dickerson's psychological problems, the psychiatrists who testified at trial described Dickerson's traits and linked these to the crimes Dickerson committed. Notably, Dickerson's post-conviction experts did not uncover any previously undiagnosed psychological or physical conditions. Under these circumstances, I cannot conclude that counsel's alleged deficiencies prejudiced the outcome of Dickerson's sentencing proceeding. *See Slaughter v. Parker*, ___ F.3d ___ (Nos. 01-6359/6462 6th Cir. June 13, 2006); *Martin*, 280 F.3d at 613.

Our precedent supports the conclusion that Dickerson has not shown prejudice. *See, e.g.*, *Hill v. Mitchell*, 400 F.3d 308, 331-32 (6th Cir.), *cert. denied*, 126 S. Ct. 744 (2005)(rejecting claim of ineffective assistance of counsel where a mitigation psychologist was not retained until the day before the mitigation hearing, as the mitigation theory that the psychologist presented did not differ materially from the one that would have been presented with more preparation); *Martin*, 280 F.3d at 614 (psychologist's post-conviction assertion that petitioner suffered from a "severe psychological disorder" did not show that petitioner was prejudiced by the use of a psychological workup prepared by the state); *McQueen v. Scroggy*, 99 F.3d 1302, 1312-13 (6th Cir. 1996) (counsel was not ineffective for presenting an expert who gave a frank opinion that petitioner was sociopathic).

Defense counsel introduced a lot of mitigating evidence. In hindsight, of course, one can always find additional witnesses who could have testified in mitigation, but the issue is whether it was prejudicial to fail to have those witnesses testify. Some of the evidence which Dickerson claims should have been produced in mitigation is in direct contradiction to testimony at trial or with other testimony which he suggests should have been introduced. For instance, he suggests that someone should have testified that his mother referred to him as "the moron." However, that would appear to be in direct contradiction to the testimony at trial by his sister and estranged wife that he had a close bond to his mother and went into a severe depression after his mother died. Moreover, Dickerson suggests that proof should have been presented that Dickerson had an ideation attachment to his mother which prevented him from having a meaningful relationship with another woman. Again, that would be contradicted by evidence that his mother called him a moron or by a mother who was engaged in prostitution. Therefore, I do not find prejudice, so I would affirm the decision of the district court in concluding that the Ohio Court of Appeals's decision was not an unreasonable application of *Strickland*.