*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0073p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ERNEST B. EADY,

        *Petitioner-Appellant,*

    *v.*

JACK MORGAN,

        *Respondent-Appellee.*

No. 06-5731

>

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 05-00069—Robert Leon Jordan, District Judge.

Argued: November 29, 2007

Decided and Filed: February 13, 2008

Before: KENNEDY, MARTIN, and CLAY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Christopher R. Pudelski, AKIN, GUMP, STRAUSS, HAUER & FELD, Washington, D.C., for Appellant. David H. Findley, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Christopher R. Pudelski, Steven C. Wu, AKIN, GUMP, STRAUSS, HAUER & FELD, Washington, D.C., for Appellant. David H. Findley, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

---

## OPINION

---

    KENNEDY, Circuit Judge. Mr. Ernest B. Eady appeals the judgment of the district court denying his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Mr. Eady was convicted of second degree murder in Tennessee state court. He argues that he was entitled to a writ of habeas corpus because there was insufficient evidence to support his conviction and because his counsel had provided ineffective assistance on direct appeal. Both his claims are based on the fact that, subsequent to his conviction, Tennessee law regarding the sciencer required for second degree murder was clarified. Prior to his conviction, Tennessee state law allowed a person to be convicted for second degree murder if that person was aware of the nature of his conduct *or* if that person was aware that his conduct was reasonably certain to cause death. Mr. Eady's jury was instructed consistent with this definition. It is now clear that, to be convicted of second degree murder under Tennessee law, a person must be aware that the nature of his conduct is reasonably certain to result in death. Mr. Eady asserts that there was insufficient evidence to prove this sciencer, and that, on

1

direct appeal, his appellate counsel should have argued for a new trial on the basis that his trial jury had been improperly instructed. The Tennessee Court of Criminal Appeals ruled against Mr. Eady on both issues on state post-conviction review. The district court similarly found Mr. Eady's arguments unpersuasive, and accordingly denied Mr. Eady's petition. Upon review, we conclude that the district court was correct, and we accordingly affirm the district court's judgment and deny Mr. Eady's petition.

# BACKGROUND

## I. Mr. Eady's State Trial

Mr. Ernest B. Eady was convicted of second degree murder for the killing of Robert Fletcher. On November 21, 1998, the night of the killing, Mr. Eady was drinking in a club owned by James Cannon.[1] Prior to that night, Mr. Eady had on occasion been kicked out of the club because "he had a habit of just pouring drinks on the floor and saying, 'This is for my dead homey,' . . . ." When Mr. Eady would be kicked out, he would verbally abuse and threaten James Cannon, although he would not become physically violent and he "would always come back and apologize later when he calmed down . . . ."

At 3:30 AM that night, Mr. Eady again poured his drink on the floor and was acting "loud and boisterous." James Cannon, therefore, asked Mr. Eady to leave. Mr. Eady "started at [James Cannon], and his friends held him back." As Mr. Eady's friends took him out of the club, Mr. Eady "went by the tables and chairs, [and] he picked them up and threw them on the floor." He also threatened James Cannon, saying things like, " 'I am going to get you.' " At the point Mr. Eady left the club, there were about thirty-five people still inside.

James Cannon followed Mr. Eady and his friends outside to ensure that he did in fact leave. James Cannon witnessed Mr. Eady's friends take him away. He then reentered the club.

About forty-five minutes after Mr. Eady left the club, roughly around 5:00 AM, he returned and signaled at the door. Mark Cannon, the proprietor's son who was working the door that night, saw Mr. Eady through the peephole. His father told him not to open the door for Mr. Eady. Mark Cannon refused Mr. Eady entrance, but a patron wanted to leave the club and Mark Cannon had to open the door. When Mark Cannon opened the door, Mr. Eady started to climb the steps to enter the club, and Mark Cannon told him that he was not permitted to enter.

Mark Cannon then observed that Mr. Eady was holding a gun in his hand. It appeared to be a black, semi-automatic .9 millimeter. Another patron also observed Mr. Eady at the door holding a gun.

Mark Cannon partially closed the door, but it remained open about a foot and Mark Cannon talked with Mr. Eady, who was standing about six feet from the door. Mr. Eady wanted to enter the club, and he asked Mark Cannon "several times," " 'Where is he at?' " as he looked inside the club from the steps. At this point there were anywhere from twenty-five to forty people inside the club and the parking lot was full of cars. Mark Cannon asked Mr. Eady to " '[t]ake the gun back to the car,' [and told Mr. Eady] that, 'It is not worth it.' "

Mark Cannon then tried to pull the door shut but Mr. Eady was pulling on the outside knob. Mr. Eady then released the knob and Mark Cannon heard him cock the gun. Mark Cannon then successfully closed the door.

---

[1] We refer to the owner by his full name, James Cannon, throughout the opinion because his son, Mark Cannon, was also a witness during the trial.

Witnesses estimated that it was anywhere from a few to forty seconds and up to a few minutes after the door was shut that four shots were fired at the front of the club. The front of the building was brick, had a steel door, and had two windows covered with particle board. Two shots were fired at the steel door. Two shots were then fired at the building. One of those shots hit the brick building and the other penetrated the particle board covering the window and struck and killed Robert Fletcher, who was standing in the back of the club.

Cathey Siler, who was sitting in her car across the street from the club while the shots were being fired, saw a black man wearing all black clothing shooting at the building. She saw the man fire two shots at the door, and then back up to a car that was waiting for him while firing two more shots, one of which was fired just before he entered the car.

Marlon Fletcher ran outside of the club to see if he could see Mr. Eady outside a minute or two after the shooting ended. While he did not see Mr. Eady, he did see Mr. Eady's vehicle, a beige 1998 Buick, about five or ten yards down the street being driven away from the club. Marlon Fletcher recognized Mr. Eady's vehicle because he had known it since Mr. Eady had purchased it.

After the police assessed the scene, they went to Mr. Eady's apartment to interview him. When asked where he had been that night, Mr. Eady responded, " 'I haven't been out of the apartment all night. I have been right here in the apartment.' He said, 'I c[a]me in at 10:00, 10:30 [PM], and I have sat right here on the couch watching TV ever since.' "

Approximately eleven months after the shooting, Mr. Eady had a conversation with the sister of the victim who had been in the club that night. After Ms. Fletcher told him how her brother's killing made her feel, Mr. Eady "went down to his knees, and [] he was crying."

Mr. Eady also had several conversations with Marlon Fletcher, the cousin of the victim. Marlon Fletcher recalled their interaction as follows:

> Well, a couple of times I had seen [Mr. Eady] – he wouldn't say nothing to me. One time I had seen him – we had seen him, and he was talking like, "I didn't mean to do that to your cousin. I love you-all like a family." And I was like, "Yeah," you know what I am saying, "I was giving you a place to stay when you had nowhere to stay," and he was just telling me how much – you know what I am saying, he didn't – that he cared about us, and that he didn't mean to do that. . . .
>
> I mean, first couple of times I seen him, he didn't say nothing to me; but then, after a while, he had seen me a couple of times, and he said he didn't mean to do that, and you know, that he loved us like a family. . . . [Mr. Eady volunteered this statement], I didn't ask him.

J.A. 64, 71.

The jury was provided the following instructions regarding the scienter required to establish second degree murder.

> Knowingly means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. A defendant acts knowingly

when he or she is aware of the conduct, or is practically certain that the conduct will cause the result, irrespective of his or her desire that the conduct or result will occur.

The requirement of knowingly is also established if it is shown that the defendant acted intentionally. Intentionally means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

J.A. at 108. Under this instruction, the jury convicted Mr. Eady of second degree murder based on all the evidence.

## II. Procedural History

### A. Direct Appeal

Mr. Eady took several steps to challenge his conviction. First, his trial lawyer, Mr. Haas, filed a direct appeal on Mr. Eady's behalf. He filed his notice of appeal to the Tennessee Court of Criminal Appeals on March 29, 2000, and then filed his brief on September 18, 2000. Mr. Haas made three primary arguments in his brief, one of which was a sufficiency-of-the-evidence argument where he contended that there was insufficient evidence to find that Mr. Eady knowingly committed murder, as required for second degree murder. He argued that the evidence at most only supported recklessness or negligence.

The Tennessee Court of Criminal Appeals filed its opinion rejecting Mr. Eady's arguments on February 13, 2001. It held that the evidence supported a second degree murder conviction because it could have convinced a rational juror that Mr. Eady had knowingly killed another. *State v. Eady*, No. E2000-00722-CCA-R3-CD, 2001 WL 120725, at *5-6 (Tenn. Crim. App. Feb. 13, 2001).

Mr. Haas then filed an application for appeal to the Tennessee Supreme Court on Mr. Eady's behalf. The application was filed on April 10, 2001. The Tennessee Supreme Court denied Mr. Eady's application for appeal on June 18, 2001.

### B. State Post-Conviction Review

### i. Trial-Level Review

Mr. Eady filed a post-conviction petition for review with the state trial court on August 10, 2001. He made two primary arguments for relief. First, he asserted that there was insufficient evidence to support his conviction under the proper definition of the term "knowingly" as determined by the Tennessee Supreme Court in *State v. Ducker*, 27 S.W.3d 889 (Tenn. 2000). He argued that *Ducker*, a child abuse case, had defined "knowingly" for second degree murder as requiring proof that the accused acted while aware that death was the reasonably certain result of his conduct. He argued that while one may find from the evidence that he was aware of his conduct, one could not find that he was aware of the likely result. Second, he contended that his trial and appellate counsel, Mr. Haas, was constitutionally ineffective for failing to discover *State v. Ducker*, which was decided two months before Mr. Haas filed his brief on Mr. Eady's behalf before the Tennessee Court of Criminal Appeals, to realize *Ducker*'s impact on Mr. Eady's case, and to argue on direct appeal that *Ducker* required that Mr. Eady receive a new trial because the jury had been improperly instructed regarding the definition of "knowingly."

The state opposed Mr. Eady's petition. It argued that the evidence was sufficient to support a finding that Mr. Eady was aware of the likely result of his conduct. It further maintained that Mr. Eady's counsel was not ineffective because *Ducker* was a child abuse case, and that the Tennessee Supreme Court had merely stated in dicta that second degree murder was a result-of-conduct offense, as compared to child abuse, which was a nature-of-conduct offense requiring only that the offender be aware of his actions. Additionally, it pointed out that the state criminal appellate court had not settled the issue until April 16, 2002, in *State v. Page*, 81 S.W.3d 781 (Tenn. Crim. App. 2002), and that the appellate court itself had recognized it was settling the issue in that case, *see Page*, 81 S.W.3d at 787-88.

At the state trial court's hearing on Mr. Eady's post-conviction petition, Mr. Haas, Mr. Eady's trial and appellate counsel, testified. At the time of the trial and direct appeal, Mr. Haas was one member of a two-person law firm and the other member was ill, fighting lung cancer. Mr. Haas was a general practitioner whose cases consisted of "a fair percentage of criminal defense cases," many of which were appealed by Mr. Haas. Mr. Haas kept current on the law through the official publications of Tennessee state court decisions, as well as through advance sheets of decisions and the Tennessee Attorney's Memo (TAM), which came out on a weekly basis and reported "most if not all" appellate decisions. Mr. Haas did not have access to electronic legal research.

Regarding his handling of Mr. Eady's appeal, Mr. Haas testified that he had "prepared and researched and filed a brief on Mr. Eady's behalf." J.A. at 118. He further stated that he had researched "many cases" in preparing Mr. Eady's brief, only some of which he cited, but that he did not recall seeing *Ducker*. J.A. at 122-23. While Mr. Haas made a sufficiency argument, he did not argue for a new trial based on the fact that the jury had been instructed on both a result-of-conduct and nature-of-conduct definition of "knowingly," rather than just the result-of-conduct version.

The state trial court granted Mr. Eady post-conviction relief because it determined Mr. Haas ineffective. Even though it found the instruction incorrect and Mr. Haas ineffective for failing to argue the issue on appeal, the trial court did "not fault[] the district attorney" for failing to correct the instruction. J.A. at 141-42. Additionally, the trial court stated that it "d[id]n't fault Mr. Haas [because] this was developing law at that time . . . ." J.A. at 141-42.

### ii. Appellate-Level Review

The state appealed the trial court's grant of relief to the Tennessee Court of Criminal Appeals. It argued that the trial court's decision was incorrect because Mr. Eady had not been rendered ineffective assistance of counsel.

The Tennessee Court of Criminal Appeals agreed with the state and reversed the trial court on March 23, 2004. *Eady v. State*, No. E2002-03111-CCA-R3-PC, 2004 WL 587639 (Tenn. Crim. App. Mar. 25, 2004). It found that, based upon the record evidence, Mr. Haas did not provide ineffective assistance primarily because Mr. Haas would have been making a relatively novel argument, and it is not incompetent to fail to make such arguments. *Eady*, No. E2002-03111-CCA-R3-PC, 2004 WL 587639, at *8.

Mr. Eady filed an application for appeal to the Tennessee Supreme Court on May 24, 2004. The Tennessee Supreme Court denied his application for appeal on October 11, 2004.

### C. Federal Post-Conviction Review

Mr. Eady then filed this habeas corpus petition in the United States District Court for the Eastern District of Tennessee on February 3, 2005. He again asserted that insufficient evidence

supported his conviction and that his trial and appellate counsel had provided him constitutionally ineffective assistance.

The district court denied Mr. Eady's petition. It found that the state court's determination that sufficient evidence supported Mr. Eady's conviction was not an unreasonable application of the Supreme Court's *Jackson* standard of sufficiency. *Eady v. Morgan*, No. 3:05-CV-69, 2006 WL 1288564, at *2-3 (E.D. Tenn. May 9, 2006). It further found that the state court's determination that Mr. Haas did not provide Mr. Eady constitutionally ineffective assistance during the trial or on direct appeal was not an unreasonable application of the Supreme Court's *Strickland* standard of incompetence. *Eady*, No. 3:05-CV-69, 2006 WL 1288564, at *3-4.

## ANALYSIS

Defendant argues on appeal that the district court erred in denying his petition for a writ of habeas corpus. Mr. Eady again argues that he is entitled to a writ of habeas corpus because insufficient evidence supports his conviction and because his appellate counsel provided ineffective assistance on direct appeal. We conduct *de novo* review of the district court's denial of Mr. Eady's petition, which was based on a determination that the state court did not unreasonably apply settled Supreme Court precedent when it concluded that sufficient evidence supported Mr. Eady's conviction and that Mr. Haas, Mr. Eady's appellate counsel, did not provide ineffective assistance on direct appeal. *See Joseph v. Coyle*, 469 F.3d 441, 453-54 (6th Cir. 2006); *Lott v. Coyle*, 261 F.3d 594, 606 (6th Cir. 2001).

Because this case involves a petition for a writ of habeas corpus from a state conviction, our review is constrained by previous state court determinations, as required by 28 U.S.C. § 2254. Under that statute, we can disagree with a state court's legal determination only when it was "a decision that was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (2006). "A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). "A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Id.* at 406.

We can also disagree with a state court's legal determination when it was "a decision that . . . involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involv[ing] an unreasonable application of . . . clearly established Federal law.' " *Williams*, 529 U.S. at 407-08 (alterations in original). It is important to remember "that an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphases in original).

We are also constrained in our determination of the facts from the record after a state court has ruled on the facts of the case. We may only disagree with a state court's determination of the facts when the petitioner proves by clear and convincing evidence that the state court's findings were "unreasonable . . . in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2), (e)(1). Because the state court's decisions were not unreasonable, we deny Mr. Eady's petition for a writ of habeas corpus

I. Sufficient Evidence

Mr. Eady argues that his conviction is not supported by sufficient evidence. He argues that the evidence did not support a finding that he was the shooter. Additionally, he argues that the evidence did not support a finding that he "knowingly" killed Robert Fletcher.

*Jackson v. Virginia* established the test for challenges based on sufficiency of the evidence. It held that a reviewing court's task is

> to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. . . . [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

443 U.S. 307, 318-19 (1979) (emphasis in original).

The Tennessee Court of Criminal Appeals on direct appeal was the last state court to review Mr. Eady's sufficiency challenge. It held that sufficient evidence supported Mr. Eady's conviction. Specifically, it pointed to the following evidence as sufficient to convince a reasonable trier of fact that Mr. Eady was the shooter and that he had "knowingly" murdered another:

> The evidence viewed in the light most favorable to the state reveals that the defendant was asked to leave the lodge after pouring a drink onto the floor. The defendant was uncooperative and threatened James Can[n]on. The defendant left the lodge but returned later with a gun. Mark Ca[n]non, Alicia Fletcher, and Marlon Fletcher said that they saw the defendant outside the lodge. Further, Mark Can[n]on and Marlon Fletcher saw that the defendant had a gun, and the gun looked like a .9 millimeter. Additionally, Cathey Siler stated that she saw a black male shoot several shorts into the front of the lodge, including one shot from the street before he got into a car. Alicia Fletcher said that the shots were fired within seconds after Mark Can[n]on closed and locked the lodge's door. A hole caused by a bullet was found in the wooden sign that covered a window on the front of the building. The path of travel from the victim's body to the hole was consistent with the location in the street where a .9 millimeter shell casing was found. Also, Marlon Fletcher said that he saw the defendant's car leaving the scene about one to two minutes after the shots were fired. Finally, the proof showed that the defendant said to Marlon Fletcher, "I didn't mean to do that to your cousin." From this evidence, a rational jury could have found beyond a reasonable doubt that the defendant shot the victim.

> The evidence further reveals that the defendant had patronized the lodge several times before this incident. The front of the lodge was brick with two steel doors and two windows which were covered by particle board. Officer Waggoner said that the distance from the bullet hole in the window to the victim's body was thirty-three feet, eight inches and that the length of the lodge was about forty feet.

> Photographs of the inside and outside of the lodge were introduced into evidence and viewed by the jury. When the defendant first arrived at the lodge, the parking lot was almost full of cars, and there were about thirty-five to forty people inside the lodge. When the defendant returned with the gun, the parking lot was full of cars. Roberta Stevens testified that the lodge was fairly crowded that night, and Cathey Siler said that the lodge was crowded. Also, Officer Waggoner photographed the inside of the lodge when eight people were present, and he said that the lodge would have been crowded if thirty-five to forty people were inside. This photograph was introduced into evidence. From this evidence, the jury could have reasonably inferred that the defendant was aware that the windows were covered by particle board and that the lodge was crowded. A rational jury could have found beyond a reasonable doubt that the defendant was aware that his conduct was reasonably certain to cause death.

*State v. Eady*, No. E2000-00722-CCA-R3-CD, 2001 WL 120725, at *5-6 (Tenn. Crim. App. Feb. 13, 2001).

We cannot say that the decision of Tennessee Court of Criminal Appeals was an unreasonable application of *Jackson*. *See* 28 U.S.C. § 2254(d)(1). The evidence is all circumstantial, but we cannot say it is so deficient that no rational trier of fact would find Mr. Eady guilty of second degree murder beyond a reasonable doubt.

Mr. Eady, however, disagrees with district the court's conclusion for two primary reasons. First, he alleges that an incorrect jury instruction was used that permitted the jury to find him guilty of second degree murder if he was aware of his conduct, rather than requiring the jury to find that he was aware that his conduct was reasonably certain to result in death. While this is true, the Tennessee Court of Criminal Appeals determined that Mr. Eady could have been found guilty under a proper jury instruction. It held that, based on the evidence in the second paragraph quoted above, "[a] rational jury could have found beyond a reasonable doubt that the defendant was aware that *his conduct was reasonably certain to cause death*." Because this conclusion was reasonable, any argument Mr. Eady has about the jury instructions must be made as a claim for ineffective assistance of counsel, which is assessed in the next Section.

Mr. Eady makes a second argument in an attempt to undermine the state court's conclusion. He argues that there was no proof that he intended to kill the victim, Robert Fletcher, and that the state admitted that fact in its closing argument. *See* J.A. at 88 ("Mr. Eady shot Robert Fletcher that night. He may not have meant to shoot Robert. He meant to shoot Mr. Cannon, but he missed Mr. Cannon and hit Robert, the man who he considered a brother.").

This argument also fails. Second degree murder does not require that the accused be aware that his conduct was reasonably certain to cause the death of a particular person. *See State v. Ely*, 48 S.W.3d 710, 724 (Tenn. 2001). Mr. Eady, therefore, only had to be aware that his conduct was reasonably certain to cause someone's death. The state court concluded that the evidence proved that he was, and this conclusion was not an unreasonable application of *Jackson*.

## II. Ineffective Assistance of Counsel

Mr. Eady also challenges the assistance provided by his counsel on direct appeal. A criminal defendant is entitled to effective assistance of counsel on a direct appeal of his conviction. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). The seminal case that established the test for effectiveness was

*Strickland v. Washington*, 466 U.S. 668 (1984). When a defendant "claim[s] that counsel's assistance was so defective as to require reversal of a conviction," he "must [first] show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Described otherwise, "the defendant must show that counsel's representation fell below an objective standard of reasonableness," which means proving that "counsel was not 'a reasonably competent attorney' and the advice was not 'within the range of competence demanded of attorneys in criminal cases.' " *Id.* at 687-88 (quoting *McCann v. Richardson*, 397 U.S. 759, 770, 771 (1970)).

"Competence," then, involves a two-step process. First, prior to making a decision or providing advice, an attorney must conduct a "thorough investigation of law and facts relevant to plausible options." *Id.* at 690. After such investigation, the attorney then must make a reasonable decision based upon that investigation. *Id.* at 691. A particular investigation may not require much. For instance, the attorney may "investigate" his or her own mind for previous knowledge about pretrial preparations. The decision not to investigate past his or her own previous knowledge, however, may be held to be an unreasonable decision in certain circumstances. If the attorney has not before handled a serious criminal trial, deciding to rely solely on his or her own previous knowledge is probably unreasonable. In such circumstances, his or her own lack of knowledge would demonstrate that no reasonably competent attorney would cease investigating based on such skimpy knowledge. *See Wiggins v. Smith*, 539 U.S. 510, 523, 525, 527 (2003) (describing how an attorney's decision to not investigate further is unreasonable when, based on the investigation up to the point of decision, the attorney has no reason to believe further investigation would be "fruitless," and the facts revealed by the investigation would have caused a reasonable attorney to decide to investigate further).

There are many factors to consider when determining whether an attorney's decision to cease further investigation was unreasonable. For instance, the ease with which further investigation could be accomplished is relevant to the inquiry. *Rompilla v. Beard*, 545 U.S. 374, 386 n.4 (2005). The most important factor, however, is why an attorney ceased investigating. If the attorney was looking for the proverbial needle in a haystack and had good reason to doubt its existence (i.e. had already conducted an investigation of some sort), the attorney is not unreasonable in ceasing his investigation. *See id.* at 389. If the attorney believed that limited resources were better spent investigating other possibilities that he had reason to believe were more promising, the attorney is not unreasonable in ceasing his investigation. *Id.* at 395 (O'Connor, J. concurring). If the attorney had "no reason to question the authenticity, accuracy, or relevance of" particular items of the prosecution's evidence, the attorney's choice not to investigate those aspects of that evidence is not unreasonable. *See United States v. Cronic*, 466 U.S. 648, 664 (1984).

When determining whether a particular decision was reasonable, we must keep in mind that we "indulge a strong presumption" that the attorney was competent. *Strickland*, 466 U.S. at 689. The defendant bears the burden of proving that the decision was "outside the wide range of professionally competent assistance." *Id.* at 690; *see also Cronic*, 466 U.S. at 658 (" 'Whenever we are asked to consider a charge that counsel has failed to discharge his professional responsibilities, we start with a presumption that he was conscious of his duties to his clients and that he sought conscientiously to discharge those duties. The burden of demonstrating the contrary is on his former clients.' " (quoting *Matthews v. United States*, 518 F.2d 1245, 1246 (7th Cir. 1975))).

Mr. Eady claims that Mr. Haas failed to provide competent assistance on his direct appeal. The trial judge had instructed Mr. Eady's jury that it could find him guilty of second degree murder if it determined that he "knowingly" killed Robert Fletcher. "Knowingly" was defined as either the accused's awareness of the nature of his conduct or the accused's awareness of the reasonably certain result of his conduct. Mr. Eady claims that this instruction was erroneous because second

degree murder was solely a result-of-conduct of offense and allowing the jury to convict Mr. Eady based on awareness of his nature-of-conduct lessened the state's burden of proof. He alleges that Mr. Haas should have recognized and raised the error on direct appeal.

Mr. Eady claims that Mr. Haas provided ineffective assistance for not recognizing and raising the error for two reasons. First, he claims that Mr. Haas decided not to research at all and that this decision was unreasonable. Pet'r-Appellant's Reply Br. at 3-6. Second, he argues in the alternative that even if Mr. Haas did research, his decision to cease researching was unreasonable because a reasonable attorney would have done an amount of research that would have located the cases he cites, and a reasonable attorney then would have raised the argument on direct appeal. Pet'r-Appellant's Reply Br. at 6-9.

The main case Mr. Eady claims Mr. Haas should have located is *State v. Ducker*, 27 S.W.3d 889 (Tenn. 2000), a decision that was rendered on July 4, 2000. In that case, the Tennessee Supreme Court held that the type of "knowing" required to convict someone of child abuse was an awareness of the nature of the conduct. The Court contrasted child abuse to second degree murder, which it stated in dicta was a result-of-conduct offense. *Ducker*, 27 S.W.3d at 896.

Mr. Eady also claims that Mr. Haas should have located *State v. Dupree*, No. W1999-01019-CCA-R3-CD, 2001 WL 91794 (Tenn. Crim. App. Jan. 30, 2001) (unpublished), an unpublished decision of the Tennessee Court of Criminal Appeals regarding second degree murder that relied on the *Ducker* dicta. Both *Ducker* and *Dupree* were decided after Mr. Haas filed a notice of appeal, which was March 29, 2000. *Ducker* was decided roughly two months prior to the time Mr. Haas filed the brief, on September 18, 2000. *Dupree* was decided after Mr. Haas had argued Mr. Eady's case before the Tennessee Court of Criminal Appeals, but roughly two weeks before the court rendered its decision, on February 13, 2001.

The Tennessee Court of Criminal Appeals rejected Mr. Eady's arguments on state post-conviction review. It held that Tennessee state case law permitted a result-of-conduct and nature-of-conduct instruction before *Ducker*. Even though *Ducker* may have cast some doubt on the previous law, the Court held that it was not constitutionally ineffective for Mr. Haas to fail to find the case and so assert because *Ducker* was a child abuse case, not a second degree murder case, and the statement from *Ducker* that Mr. Eady relied on was merely dicta. Additionally, it found that Tennessee law was unclear before *State v. Page*, 81 S.W.3d 781 (Tenn. Crim. App. 2002), decided in January 2002, after Mr. Eady's direct appeal had been briefed and argued. Indeed, the court held in *State v. Page* that the law regarding second degree murder was "far from clear" in January 2001, four months after Mr. Haas had briefed Mr. Eady's direct appeal. *Eady v. State*, No. E2002-03111-CCA-R3-PC, 2004 WL 587639, at *8 (Tenn. Crim. App. Mar. 25, 2004); *see Page*, 81 S.W.3d at 787.

We find that the Tennessee Court of Criminal Appeals' decision was not unreasonable under § 2254. First, the state court correctly identified *Strickland* as the governing standard. Its decision, therefore, is not "contrary to" United States Supreme Court case law. *See* 28 U.S.C. § 2254(d)(1).

The state court likewise did not unreasonably apply *Strickland* to the facts of Mr. Eady's case. *See* 28 U.S.C. § 2254(d)(1). First, Mr. Eady's contention that Mr. Haas failed to investigate the relevant law is entirely unfounded. It must be remembered that Mr. Eady bears the burden of proving that Mr. Haas did not conduct an investigation, because we "indulge a strong presumption" that Mr. Haas did investigate the law. *See Strickland*, 466 U.S. at 689. Mr. Eady points to the fact that the government has not provided proof that Mr. Haas did investigate, but Mr. Eady is the one who must point to his own proof to show that Mr. Haas did not investigate. Mr. Haas testified at the state post-conviction hearing that he had "prepared and *researched* and filed a brief" for Mr. Eady's direct appeal. J.A. at 118 (emphasis added). He further testified that he had reviewed "*many*

cases" while preparing Mr. Eady's brief. J.A. at 122-23 (emphasis added). The only evidence in the record, therefore, is that Mr. Haas did conduct an investigation into the relevant law surrounding second degree murder. Mr. Eady's first contention, that Mr. Haas conducted no investigation, fails because he has not sustained his burden of proof.

Second, the state court was completely reasonable in determining that Mr. Haas was not incompetent for failing to locate *Ducker* and *Dupree* during his investigation into the law. The primary case relied on by Mr. Eady is *Ducker*. It is not unreasonable to conclude, however, that a competent attorney could have reasonably decided to cease investigating the case law on second degree murder prior to locating *Ducker*. First, it is noteworthy that the law on the knowledge required to commit second degree murder was settled prior to the *Ducker* dicta and that Mr. Eady's jury was instructed consistent with this settled law, as Mr. Eady conceded during oral argument. Second, it is noteworthy that *Ducker* was a case about the scienter required to commit child abuse, and its mention of second degree murder was an offhand reference, which was solely dicta. The decision did not, and still does not, contain any West headnotes indicating that it applies to second degree murder. Dicta of a higher court, while potentially persuasive, is not binding law on a lower court in Tennessee. *See State v. Nashville Baseball Club*, 154 S.W. 1151, 1155 (Tenn. 1913); *see also Staten v. State*, 232 S.W.2d 18, 19 (Tenn. 1950). The Court of Criminal Appeals itself realized that the law regarding the scienter required for second degree murder was "far from clear" until its decision in *Page*. *Page*, 81 S.W.3d at 787-88. The court in *Page* stated the following:

> In fairness to the trial court, it was far from clear at the time of trial[2] how the "knowing" *mens rea* for second degree murder should be defined in jury instructions. The trial court's charge on the definition of "knowing" was verbatim from [the Fifth Edition of the Tennessee Pattern Jury Instructions]. In *Ducker*, decided only months prior to the trial of this case, our supreme court did state that second degree murder was a 'result-of-conduct' offense. However, *Ducker* was not a second degree murder case; nor did *Ducker* discuss jury charges for result-of-conduct offenses. The actual holding in *Ducker* was that aggravated child abuse is a nature-of-conduct offense, rather than a result-of-conduct offense. The first case to actually find reversible error in the failure to charge second degree murder was strictly a result-of-conduct offense was *State v. Dupree*; however, *Dupree* was filed several days after the trial in this case. Furthermore, the trial court in *Dupree* charged only the nature of the conduct and circumstances surrounding the conduct; it omitted entirely the result of the conduct element.

*Id.* (citations omitted).

We cannot say it was unreasonable for the Tennessee Court of Criminal Appeals to hold that it is not incompetence of counsel for a lawyer to fail to locate dicta in a case involving a different crime. The United States Supreme Court has itself realized that it is not incompetence when a defense attorney "overlook[s]" an argument that can be made on appeal when the case law's application to a particular case is ambiguous. *See Engle v. Isaac*, 456 U.S. 107, 131-34 (1982). Furthermore, the Supreme Court has held that "[i]t will often be the case that even the most informed counsel will fail to anticipate a state appellate court's willingness to reconsider a prior holding," and that doing so is not incompetence when the law is in an ambiguous state of flux. *See Smith v. Murray*, 477 U.S. 527, 536 (1986). It was not unreasonable for the Tennessee Court of Criminal

---

[2] The trial in *Page* was after Mr. Eady's direct appeal had been brief and argued.

Appeals to view Mr. Eady's case as just such a situation; it is not unreasonable to believe that Mr. Haas's failure to locate *Ducker* did not reveal "a startling ignorance of the law," *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986), nor is it unreasonable to believe that requiring Mr. Haas to conduct further legal research would be requiring him to "scour the globe on the off-chance something w[ould] turn up" and would have "promise[d] less than looking for a needle in a haystack," *see Rompilla*, 545 U.S. at 383, 389.[3]

Mr. Eady attempts to bolster his argument that Mr. Haas was incompetent by pointing to *Dupree*, an unpublished case of the Tennessee Court of Criminal Appeals. There are two problems, however, with this attempt. First, the case is unpublished. Unpublished cases may be cited in Tennessee state courts, but they are only "persuasive authority" and not binding precedent. Tenn. R. Sup. Ct. 4(G)(1). Given the lack of force of such a case, it may not be unreasonable for an attorney to fail to locate it. Second, and most persuasively, *Dupree* was decided only after Mr. Haas had already submitted a brief on Mr. Eady's behalf and, indeed, had already argued the appeal.[4] While Mr. Eady argues Mr. Haas could have supplemented his brief with *Dupree*, that is not true. Mr. Haas could submit additional citations only for arguments *he had already made*. Tenn. R. App. P. 27(d). The *Dupree* argument would be deemed waived because Mr. Haas had not asserted those grounds in his brief. Tenn. R. Sup. Ct. 10(b). Even if Mr. Haas could have added an additional argument, we do not think it unreasonable for a state court to hold that *Strickland* does not require an attorney to continue to research an appeal that he had already briefed, argued, and whose decision he expected shortly. Mr. Eady can only rely, therefore, on *Ducker* for the purpose of proving Mr. Haas incompetent. Because, as discussed above, the Tennessee Court of Criminal Appeals was not unreasonable in holding that Mr. Haas was not ineffective for failing to locate and argue *Ducker*, Mr. Eady's claim of ineffective assistance fails.

## CONCLUSION

For the foregoing reasons, Mr. Eady's petition for a writ of habeas corpus is DENIED. Additionally, Mr. Eady's motion to supplement the record with the Tennessee Attorney's Memos is DENIED because habeas review only entails determining the reasonableness of a state court's decision based upon the evidence it had before it at the time, which does not allow for introduction of new evidence.

---

[3] Indeed, even if we were not restricted in our review to Supreme Court precedent, *see* 28 U.S.C. § 2254(d)(1), our own circuit law would lead to a similar conclusion. *See, e.g.*, *Alcorn v. Smith*, 781 F.2d 580, 61-62 (6th Cir. 1986). In a case very similar to Mr. Eady's, a higher court had later declared that, at the time of the defendant's trial and appeal, the law was in a "curious state." *See Lucas v. O'Dea*, 179 F.3d 412, 420 (6th Cir. 1999). We there held that defense counsel had not been ineffective for failing to anticipate a change in the "then-prevailing law." *Id.*

[4] Although not evidence in the record and not relied upon in our decision, we also note that not even the source from which Mr. Haas could have learned of an unpublished case like *Dupree*, the Tennessee Attorney's Memo (TAM), would have reached Mr. Haas in time for him to use it. The TAM did not include a report on *Dupree* until March 5, 2001. This was roughly twenty weeks after Mr. Haas had briefed Mr. Eady's direct appeal, and, most importantly, roughly two-and-a-half weeks *after* Mr. Eady's direct appeal had been decided.